UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHRYN S. WEISS

    Plaintiff,      CIVIL ACTION NO. 06-CV-11678-DT

  vs.          DISTRICT JUDGE BERNARD A. FRIEDMAN

COMMISSIONER OF      MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

    Defendant.
_____/


REPORT AND RECOMMENDATION

I.  **RECOMMENDATION**

  This Court recommends that  Defendant's Motion for Summary Judgment be **GRANTED** (Docket # 15), that Plaintiff's Motion for Summary Judgment be **DENIED** (Docket # 11), and  that Plaintiff's complaint be **DISMISSED**.

II.  **PROCEDURAL HISTORY**

  This is an action for judicial review of the final decision by the Commissioner of Social Security that the Plaintiff was not "disabled" for purposes of the Social Security Act.  42 U.S.C. §§ 423, 1382. The issue for review is whether the Commissioner's decision is supported by substantial evidence.

  Plaintiff Kathryn S. Weiss was 44 years of age when she filed an application for Disability Insurance Benefits (DIB) on July 1, 2001.  (Tr. 47-49).  She alleged she had been disabled since June 4, 2001.  *Id.*  Plaintiff's claim was initially denied in December 2001.  (Tr. 29-32).  Plaintiff sought a review hearing before an Administrative Law Judge (ALJ).  (Tr. 33).  A hearing took place before an ALJ on March 21, 2003.  (Tr. 398-437).  Plaintiff was represented at the hearing.  (Tr. 34, 46, 398).  The ALJ denied Plaintiff's claims in an opinion issued on August 5, 2003.  (Tr. 310-22).  The Appeals Council granted Plaintiff's request for review of the ALJ's decision on February 27, 2004 and remanded the case

back to the ALJ for further proceedings and issuance of a new opinion. (Tr. 325-27). A second hearing took place before an ALJ on August 3, 2004. (Tr. 438-87). Plaintiff continued to be represented by counsel. The ALJ again denied Plaintiff's claim in an opinion issued on January 21, 2005. (Tr. 15-28). The Appeals counsel denied Plaintiff's request for review and the ALJ's decision is now the final decision of the Commissioner. (Tr. 8-14). Plaintiff appealed the denial of her claim to this Court, and both parties have filed motions for summary judgment.

III.   **MEDICAL HISTORY**

A.      **Medical History Pre-Alleged Onset Date**

A CT scan taken of Plaintiff's lumbar spine in 1991 showed a small central disc herniation at L4-L5 but no spinal stenosis. (Tr. 108). An MRI of Plaintiff's cervical spine taken in 1995 showed right-sided uncovertebral joint degenerative spurring causing mild to moderate narrowing of the right neural foramen. No significant disc abnormality or herniation was noted and there was no evidence of spinal stenosis. (Tr. 109).

An MRI and x-ray taken of Plaintiff's right shoulder in December 1997 showed calcific tendinopathy of the posterior portion of the rotator cuff and a mild degenerative change to the acromioclavicular joint. (Tr. 120-22).

In June 1999 Plaintiff was seen by an orthopedic surgeon, Dr. Michael Wolohan, for treatment of the right shoulder. Upon examination, Plaintiff had 80 degrees of active abduction, 100 degrees of active forward flexion, and 120 to 130 degrees of passive forward flexion. (Tr. 129, 289). Plaintiff demonstrated good muscle strength and exertional rotation. *Id.* Dr. Wolohan assessed Plaintiff as having significant impingement of the right shoulder. He administered a lidocaine injection, which resulted in dramatic and remarkable improvement in Plaintiff's pain, but the relief was only temporary. Dr. Wolohan discussed treatment options with Plaintiff, which included surgery. Plaintiff elected to

have a right shoulder acromioplasty.  *Id.*  Plaintiff underwent the surgery on July 12, 1999.  She tolerated

the procedure well and was discharged from the hospital the same day.  (Tr. 129-44).

Plaintiff reported to Dr. Wolohan in December 2000 that she still had soreness about the

shoulders and some numbness in both arms.  (Tr. 273).  An examination showed good muscle strength

in both arms with no evidence of gross motor weakness.  Plaintiff's neck range of  motion was good

overall.  *Id.*  Radiographs of Plaintiff's neck demonstrated mild arthritis.  (Tr. 272).  An electromyogram

study was performed on Plaintiff's upper extremities.  (Tr. 152).  The study showed mild carpal tunnel

syndrome of the left wrist.  There was no evidence of plexopathy or radiculopathy.  *Id.*  Dr. Wolohan

stated that Plaintiff had a tolerable level of symptoms involving the left wrist.  (Tr. 270).

In 2001 Dr. Wolohan continued to treat Plaintiff for pain in both shoulders, the neck, and the

left hand and wrist.  (Tr. 265-70).  Dr. Wolohan advised Plaintiff to reduce her work activity to a

tolerable level.  (Tr. 269).  In February 2001 Dr. Wolohan noted that Plaintiff had an occasional loss of

dexterity in her right hand but that she had good pulses, movement, and strength.  (Tr. 268).  In May

2001 Dr. Wolohan reported that Plaintiff had good forward flexion and abduction of her shoulders with

good arm strength.  However, Plaintiff stated that she had more pain after work.  (Tr. 267).  Dr.

Wolohan scheduled Plaintiff for an MRI of her neck and back and stated that it would be "wise" for

Plaintiff not to work.  *Id.*  An MRI taken of Plaintiff's cervical spine showed mild early degenerative disc

disease with a disc bulge at each level of C4–C5 through C6-C7 causing minimal effacement of the

ventral thecal sac.  There was also mild to moderate spondylotic narrowing of the right C5 neural

foramen but no focal disc herniation.  (Tr. 154).

Plaintiff returned to Dr. Wolohan on May 29, 2001.  He noted that Plaintiff had a rheumatoid

work-up, which was positive for ANA.  (Tr. 153, 266).  Dr. Wolohan discussed various management

options with Plaintiff.  Plaintiff was advised to let Dr. Wolohan know if she wanted to try physical

-3-

therapy.  Dr. Wolohan also strongly encouraged Plaintiff to stop working if her symptoms were better when she did not work and if it was a financial option for her.  (Tr. 266).

### B.   Medical History Post-Alleged Onset Date

In June 2001 Dr. Wolohan wrote a letter to Plaintiff suggesting that the severity of Plaintiff's symptoms associated with her ongoing shoulder difficulties and degenerative disc disease with some spondylosis in the neck would increase with work activity.  (Tr. 155).  Therefore, Dr. Wolohan recommended that Plaintiff not work at her current employment and that she cease work activities.

Plaintiff was treated in the emergency room in August 2001 for shortness of breath.  (Tr. 156-60).  Examination findings were normal.  (Tr. 157).  An EKG and chest x-ray were normal.  (Tr. 158).  Plaintiff was discharged from the hospital in stable condition and was given a nebulizer and antibiotics for a sinus infection.  (Tr. 159).

Dr. Wolohan subsequently referred Plaintiff to a neurosurgeon for evaluation.  (Tr. 162).  Plaintiff was thereafter examined by Dr. Mark W. Jones in October 2001.  (Tr. 163-64).  Dr. Jones conducted an examination and reviewed Plaintiff's May 2001 MRI.  (Tr. 163).  Dr. Jones' examination revealed tenderness over the levator scapula, the occipital area bilaterally, and the trapezious area in the mid-region.  *Id.*  Plaintiff had no muscle atrophy in the upper extremities, a good range of spinal motion, and 2+ reflexes at the biceps, triceps, knees, and ankles.  Plaintiff's grip was diminished on both sides at 4+ and she had some decreased pin prick sensation over the volar aspect of digit 2 on both sides. *Id.*  Dr. Jones concluded that surgical intervention would not be beneficial for Plaintiff.  Dr. Jones recommended massage therapy or acupuncture.  *Id.*  He also recommended that Plaintiff see a neurologist about her migraine headaches.  *Id.*

-4-

Plaintiff subsequently saw Dr. Debasish Mridha, a neurologist.  Plaintiff told Dr. Mridha that she had daily migraines accompanied by nausea, vomiting, and confusion.  (Tr. 165).  Dr. Mridha conducted an electroencephalogram ("EEG") to test for underlying epileptiform activity.  *Id.*  The results of the test were borderline because amplitude was very low throughout the recording.  There was no obvious focal slowing, diffuse slowing, or epileptiform activity noted.  *Id.*

A consultative examination was also performed on Plaintiff in October 2001 by Dr. Siva Sankaran.  (Tr. 169-71).  Dr. Sankaran reviewed Plaintiff's pulmonary function test and diagnosed Plaintiff with mild restrictive airway disease.  She concluded that Plaintiff had a history of asthmatic bronchitis and asthma by history but that her clinical examination revealed minimal findings.  (Tr. 171).  Dr. Sankaran's examination of Plaintiff also revealed normal neurological functioning.  An examination of Plaintiff's musculoskeletal system showed no edema of the feet, tenderness of the sacroiliac joint on the right side and of the bilateral shoulder joints, and decreased bilateral grip strength.  However, Plaintiff was able to open a jar, button clothing, write legibly, pick up a coin, and tie shoelaces with either hand.  *Id.*

In November 2001 Dr. Michael McManus reviewed Plaintiff's medical records and completed a Physical Residual Functional Capacity "(RFC") Assessment form.  (Tr. 178-85).  Dr. McManus concluded that Plaintiff could: (1) lift 20 pounds occasionally and 10 pounds frequently; (2) stand/walk for about 6 hours in an 8-hour workday; (3) sit for about 6 hours in an 8-hour workday; (4) frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and (5) frequently handle, finger, and feel with both hands.  (Tr. 179-81).  However, Dr. McManus concluded that Plaintiff was limited in her ability to push/pull with her lower extremities,  could never climb ladders, ropes, or scaffolds, could never reach overhead, and should not to be exposed to vibration.  (Tr. 179-82).

Plaintiff also returned to see Dr. Wolohan in November 2001 for complaints of bilateral knee pain. (Tr. 265). An examination showed tenderness over the patellar tendons but good extension and range of motion. No mis-alignment, swelling, or effusion of the knees was present. *Id.* Dr. Wolohan diagnosed Plaintiff with patellar tendonitis. He recommended icing and symptomatic treatment. *Id.* Dr. Wolohan also noted that Plaintiff was not working, which he thought was "wise" given her "multitude of symptoms." *Id.*

Plaintiff returned to Dr. Wolohan in May 2002 for continued complaints of knee and foot pain. Plaintiff demonstrated a good range of motion in the knee with no swelling, effusion, or mis-alignment. Radiographs were normal with no significant joint space narrowing, arthritis, or fractures seen. Multiple x-rays of Plaintiff's foot showed no fractures. Dr. Wolohan advised Plaintiff to continue with symptomatic treatment, hot showers, use of a heating pad, and Tylenol. (Tr. 263).

Dr. Wolohan wrote a letter to Plaintiff's attorney in December 2002 in which he summarized Plaintiff's medical history, diagnoses, and treatment from 1999 to present. Dr. Wolohan opined that Plaintiff was disabled from substantial gainful activity due to the multiplicity of her complaints and the involvement of 3 out of 4 extremities (right arm and leg and left arm). (Tr. 294). Dr. Wolohan stated that his opinion was based upon Plaintiff's history, clinical examinations, and objective findings. He also noted that Plaintiff had tried to return to work but that work had consistently aggravated and increased Plaintiff's level of symptoms. Dr. Wolohan stated in conclusion that Plaintiff was disabled from work, including sedentary activities "as those would involve use of her arms as well." (Tr. 294-95).

Plaintiff underwent another consultative examination in May 2003 which was performed by Dr. Joseph Craig. (Tr. 296-304). Dr. Craig observed that Plaintiff was unable to heel walk, toe walk, or heel-to-toe walk. She was also unable to squat or recover from the squatting position. Plaintiff's gait had a mild limp on the right. (Tr. 298, 302). However, Plaintiff had no neurological disorganization

-6-

that would cause lunging, lurching, stumbling, or falling.  She also did not need an assistive device.  *Id.*
Plaintiff was able to tie shoelaces, button clothing, dial a telephone, dress and undress, make a fist, pick
up coins and pencils, and write.  (Tr. 299, 301).  Plaintiff experienced pain when bending, stooping,
carrying, pushing, and pulling.  *Id.*  She also had deficits when trying to outstretch her arms or reach
overhead.  *Id.*

An evaluation of Plaintiff's lower extremities showed no atrophy, edema, ligamentous laxity,
or joint subluxation.  Plaintiff's lower extremities were symmetric with no circulatory deficits.  (Tr. 298).
Muscle strength was 4-/5.  Plaintiff's cervical and lumbar spinal ranges of motion were limited.  (Tr.
299, 303).  There was tenderness to palpation but no active muscle spasms were noted.  *Id.*  Straight leg
raising tests were negative and reflexes were normal.  (Tr. 301-02).  An examination of Plaintiff's upper
extremities showed a restricted a range of motion.  Muscle strength was 4 to 4-/5.  There was a
diminished median distribution light pinprick sensation bilaterally but Plaintiff's reflexes were normal.
(Tr. 299, 301).

Dr. Craig also completed a RFC assessment form.  (Tr. 305-07).  He opined that Plaintiff:  (1)
could occasionally lift/carry less than 10 pounds; (2) was not affected in her ability to stand/walk/sit;
(3) was limited in her ability to push/pull with her upper extremities; (4) could occasionally balance,
kneel, and crouch; (5) could never climb or crawl; (6) was limited in her ability to reach in all directions,
handling, finger, and feel; and (7) should avoid vibration and hazards such as machinery and heights.
*Id.*

In April 2004 Dr. John Kemerer, Plaintiff's treating primary care physician, wrote a letter
reciting Plaintiff's various medical conditions and treatment history.  He opined that Plaintiff was
"permanently and totally disabled" and "unable to perform any meaningful employment" as a result of
her documented medical conditions.  (Tr. 379).  He also opined that Plaintiff's prognosis was poor for

2:06-cv-11678-BAF-MKM   Doc # 16   Filed 03/07/07   Pg 8 of 22   Pg ID 567

continued activities of daily living and that over the course of the next few years, Plaintiff would require an increasing level of care to perform her activities of daily living. *Id.* Dr. Kemerer noted that Plaintiff's subjective pain was so severe that it was difficult for Plaintiff to get out of bed and that her frequent bouts of shortness of breath and fatigue kept Plaintiff from attending her children's sporting events and from maintaining her home.[1]  (Tr. 380).

Plaintiff was seen by Dr. Wolohan in May 2004 for continuing complaints of shoulder discomfort and migraines.  (Tr. 390).  Upon examination, Plaintiff had 100 to 110 degrees of forward flexion and abduction.  *Id.*  Tests showed mild arthritis in Plaintiff's shoulders.  (Tr. 391).  Dr. Wolohan recommended that Plaintiff not engage in any physical labor involving her arms.  (Tr. 390).  He advised Plaintiff not to reach, push, pull, or lift more than 5 pounds.  Dr. Wolohan further noted that these restrictions were likely long-term and that Plaintiff should not work in any capacity that involved repetitive use of the arms.  *Id.*

Plaintiff then saw Dr. Wolohan in June 2004 for complaints of right heel pain after a dog stepped on her heel.  (Tr. 388).  An examination showed tenderness at the Achilles tendon.  Range of motion in the ankle was normal and she had 5/5 motor strength.  X-rays were normal.  *Id.*  Dr. Wolohan recommended stretching exercises, Celebrex, and rest for 1-2 weeks followed by gradual resumption of full activities.  *Id.*

---

[1]     Dr. Kemerer treated Plaintiff on a regular basis for a variety of symptoms, including nose and chest congestion, throat soreness, asthma, lower back pain, lupus, knee and elbow pain, gastroesophaegeal reflux disease, migraines, and a hiatal hernia.  Dr. Kemerer generally treated Plaintiff's complaints with medication or made referrals to other doctors.  (Tr. 211-62, 368-78, 383-86, 393-97).

-8-

IV.     **HEARING TESTIMONY**

    A.     **Plaintiff's Testimony**

        1.     **March 2003 Hearing**

Plaintiff was born in 1957.  She had a high school education and an associated degree in applied science.  (Tr. 402).  Plaintiff testified that she had a driver's license and drove every day for about six miles but that she had not taken any trips outside of Saginaw area in the last two years.  (Tr. 404-05).  Plaintiff testified that she could hardly do any housework, such as laundry and cooking, because she could not bend down due to pain. (Tr. 413).  Her husband and children took care of the yard work.  (Tr. 416).  Plaintiff took a bath every day but it took her a long time to get in and out of the tub.  *Id.* She also stated that she did not drive because she did not feel safe, commenting that on one occasion she could not get back into the vehicle while at the mall.  (Tr. 414).  Plaintiff testified that her migraines caused severe neck pain, which radiated down into her arms and lower back.  *Id.*  Plaintiff told the ALJ that her fibromyalgia caused joint pain and chronic fatigue so she had to take many naps during the day.  *Id.*  Typically, she would nap 3 to 5 times a day for 1 to 3 hours each time.  (Tr. 418).  Plaintiff did not get out of bed on some days.  (Tr. 415).  Plaintiff also stated that she did not sleep well at night due to neck, hip, foot, hand, and knee pain.  (Tr. 416-17).

Plaintiff also testified that she had side effects from almost every medication that she took.  One such side effect was insomnia.  (Tr. 415, 417).  Plaintiff stated that on a good day, she could stand for 20-30 minutes but normally she could not stand for more than 10 minutes at a time.  (Tr. 417).  She could not walk very far and she could sit for about 20-30 minutes.  *Id.*  The most comfortable position for Plaintiff was to sit in a lazy-boy chair with her feet elevated.  *Id.*  Plaintiff would spend ½ the day either in the lazy-boy chair or in her bed.  *Id.*  She could not climb stairs

without using a railing to pull herself up.  *Id.*  Plaintiff also testified that she could not lift much weight for very long because she had a loss of dexterity in her hands.  She also had trouble picking up coins, writing, and typing.  (Tr. 418).  As for social activities, Plaintiff testified that she tried to go to her children's basketball games when she was able.  (Tr. 419).

        2.      **August 2004 Hearing**

Plaintiff testified that her medications sometimes worked but they caused side effects such as nausea.  Plaintiff also testified that she took Vicodin as needed, which caused concentration difficulties.  Consequently, Plaintiff stated that she took ibuprofen instead of Vicodin.  (Tr. 444-45).

Plaintiff also told the ALJ that she was doing much less at home since the last hearing.  Plaintiff testified that she did not cook, wash, clean, or grocery shop.  (Tr. 448).  According to Plaintiff, her memory was so poor that her family no longer let her shop because she would not get home by herself.  *Id.*  Plaintiff further testified that she tried to play bingo at least once a week but that she sometimes could not make it in the evening if she was too tired.  *Id.*  Plaintiff also told the ALJ that she could balance the checkbook and handle the bank account if there were not too many distractions.  *Id.*  However, she then stated that she wrote checks to some places but never sent them.  (Tr. 450).  Plaintiff reported that her pain had increased since the last hearing, especially in her left knee, foot, shoulder, and head.  (Tr. 449).  Plaintiff testified that she did not sleep much at night and, on some nights, she did not sleep at all due to the lupus.  *Id.*  Consequently, Plaintiff napped a couple of times a day and spent more time in bed.  *Id.*  Plaintiff also testified that her ability to stand had also diminished since the last hearing and that she could stand for no more than 15 to 20 minutes at a time.  (Tr. 450).

        B.      **Medical Expert's Testimony**

Dr. Mary Jo Voelpel testified as a medical expert at the August 2004 hearing after

reviewing Plaintiff's medical records and listening to Plaintiff's testimony.  (Tr.

455-82).  Dr. Voelpel was asked to testify, in part, about Plaintiff's functional limitations based

upon the medical evidence.  Dr. Voelpel opined that Plaintiff was limited to pushing, pulling, and

lifting no more than 5 pounds frequently and 10 pounds occasionally.  (Tr. 467).  She believed

Plaintiff was significantly limited in her ability to reach overhead but was likely able to reach up to

slightly higher than shoulder level.  (Tr. 468).  Dr. Voelpel also concluded that Plaintiff should not

engage in forceful or sustained gripping or grasping with at least the left hand and should avoid

constant, repetitive left wrist movements.  However, Plaintiff's fine dexterity was intact.  (Tr. 468-

69).  She further noted that Plaintiff should avoid vibrating tools, environmental pollutants,  changes

in temperature and humidity, hazardous machinery, and unprotected heights.  (Tr. 469-70).

According to Dr. Voelpel, the degenerative changes in Plaintiff's neck and her migraines would

likely be aggravated by repetitive neck motion.  (Tr. 469).  Plaintiff would not be limited in her

ability to bend at the waist but she would be restricted against repetitive bending at the knees,

stooping, stepping, kneeling, crawling, and climbing.  (Tr. 469-70).  Plaintiff was not limited in her

ability to drive a motor vehicle and did not need an option to sit/stand at-will.  (Tr. 470).  Dr.

Voelpel further indicated that Plaintiff should avoid jobs with high levels of stress due to her

possible use of steroids.  (Tr. 471).

Dr. Voelpel opined that there was no medical support for Dr. Kraemer's opinion that

Plaintiff was unable to perform any work activities. (Tr. 473).  Dr. Voelpel also disagreed with Dr.

Wolohan's conclusion that Plaintiff was restricted in her ability to sit and do sedentary functions

although she agreed with his statement that Plaintiff was restricted in her ability to repetitively use

her arms.  Dr. Voelpel further noted that Plaintiff would be able to stand for 2 hours out of an 8-

-11-

hour workday although the lack of adequate support on the concrete floor might aggravate Plaintiff's foot pain.  (Tr. 475-76).

C.     **Vocational Expert's Testimony**

Stephanie Leech, a rehabilitation counselor, testified as a vocational expert at the August 2004 hearing.  (Tr. 482-488).  The ALJ asked Ms. Leech to assume a hypothetical individual who was limited to sedentary work that involved: (1) infrequent walking, meaning no more than 10 yards at a time; (2) pushing, pulling, lifting, and carrying no more than 5 pounds frequently and 10 pounds occasionally; (3) no use of foot controls; (4) a sit/stand at-will option; (5) occasional bending at waist and knees; (6) occasional kneeling; (7) no crawling; (8) no climbing stairs or ladders; (9) occasional exposure to unprotected heights or transiently hazardous, uncovered, moving machinery; (10) frequent, but not constant, forward reaching; (11) no overhead reaching; (12) occasional reaching slightly above shoulder level; (13) frequent reaching below shoulder level; (14) no use of vibratory tools; (15) no forceful or sustained gripping or grasping with the left hand; (16) no constant repetitive left wrist movements; (17) no exposure to dust, fumes, and airborne pollutants; (18) a controlled environment in terms of temperature and humidity so as to avoid high humidity and sudden or extreme changes in temperatures; (19) an occasional need for rotation, flexion, or hyper-extension of the neck; and (20) no high stress work due to the effects of medication, such as fast-paced work, work requiring a constant need to respond to interruptions, or work requiring extended periods of concentration.  (Tr. 484-85).

Ms. Leech testified that such a person could perform various work including 3,500 general clerk jobs, 1,000 information clerk jobs, and 1,500 surveillance system monitor jobs in the lower peninsula of Michigan.  (Tr. 482, 487).  However, such work would be precluded for an individual

-12-

who required a 30-minute rest period every 2 hours and who had to lie down or rest twice during the workday.  (Tr. 487).

## V.   LAW AND ANALYSIS

### A.   STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  It is not the function of this court to  try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole.  *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even where substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently.  *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

**B.**      **FRAMEWORK OF SOCIAL SECURITY DISABILITY DETERMINATIONS**

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis.  In the first four steps, Plaintiff had to show that:

> (1)      he was not presently engaged in substantial gainful employment; and
>
> (2)      he suffered from a severe impairment; and
>
> (3)      the impairment met or was medically equal to a "listed impairment;" or
>
> (4)      he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work.  If not, he would be deemed disabled. 20 C.F.R. § 404.1520(f).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform."  *Her*, 203 F.3d at 391.

**C.**      **ANALYSIS**

**1.**      **Plaintiff's Credibility**

Plaintiff claims that the ALJ erred in assessing the credibility of her complaints of: (1) an inability to concentrate; (2) an inability to use her upper extremities, especially on the left, dominant side, for sustained repetitive movements; (3) her need to nap frequently throughout the day; and (4) her need to sit with her feet elevated.   The ALJ considered Plaintiff's complaints of disabling pain and symptomology and, to the extent he found them credible, he incorporated them into his RFC finding.  (Tr. 21, 318).

An ALJ's findings based on the credibility of an applicant are to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing a witness's demeanor and credibility.  *Walters, at*  531.  However, credibility assessments are not insulated from judicial

-14-

review.  Despite deference due, such a determination must nevertheless be supported by substantial evidence.  *Id.*

With regard to Plaintiff's allegations of disabling pain, Social Security regulations prescribe a two-step process.  The plaintiff must show objective, medical evidence of an underlying medical condition and: (1) objective medical evidence to confirm the severity of the alleged pain rising from the condition; or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.  20 C.F.R. § 404.1529(b) (1995); *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)).  If a plaintiff establishes such an impairment, the ALJ then evaluates the intensity and persistence of the plaintiff's symptoms. 20 C.F.R. § 404.1529(c) (1995); *Jones*, 945 F.2d at 1369-70.  In evaluating the intensity and persistence of subjective symptoms, the ALJ considers objective medical evidence and other information, such as what may precipitate or aggravate the plaintiff's symptoms, what medications, treatments, or other methods plaintiff uses to alleviate his symptoms, and how the symptoms may affect the plaintiff's pattern of daily living.  *Id.*

Plaintiff alleges that the ALJ erred in not fully crediting her claim that her ability to concentrate was significantly diminished.  Plaintiff acknowledges that the ALJ accounted for Plaintiff's concentration difficulties by limiting Plaintiff to work that involved no high stress, such as work that was fast-paced, that required a constant need to respond to interruptions, or that required extended periods of concentration.  (Tr. 484-85).  Plaintiff does not articulate how this RFC finding was faulty or point to any evidence that would suggest a more restrictive RFC was warranted as to this issue.

-15-

Indeed, substantial evidence supports the ALJ's determination that the evidence did not warrant more restrictive limitations. The ALJ noted that Plaintiff had sufficient concentration to balance a checkbook without external distractions and to play bingo on a consistent weekly basis.[2] (Tr. 448). Furthermore, Plaintiff cited to the side effects of Vicodin, her migraines, and her lupus as sources of her concentration difficulties. However, Plaintiff testified that she stopped taking Vicodin due to its side effects and instead used ibuprofen. (Tr. 444-45). Plaintiff's migraines and lupus were also treated conservatively. At the 2003 hearing, Plaintiff told the ALJ that although she had been prescribed medication for her migraines, she did not believe that it worked so she only took non-prescription strength Excedrin. (Tr. 444-45). In 2004 Plaintiff's doctor prescribed a new medication for her migraines, which Plaintiff stated helped.[3] (Tr. 357, 449). It was also noted at the 2004 hearing that Plaintiff was not taking any medication for her lupus, she had not seen a specialist to treat her lupus since she was 18 years old, and no testing had been done to test the whether

_____

[2]    Plaintiff does not challenge the ALJ's factual account of her ability to balance the checkbook absent external distractions or the ALJ's determination that she had the mental wherewithal to to participate in bingo. However, Plaintiff contends that the ALJ erroneously stated that she played bingo on a consistent basis because she also testified that she sometimes could not make it to bingo if she was too tired. Even assuming that the ALJ's use of the term "consistent" somehow missed the mark, the ALJ properly noted that an ability to concentrate on the particulars of bingo undermined Plaintiff's claim of significant lack of concentration that would preclude her from performing the work set forth in his RFC finding. The Court also notes that Plaintiff's husband indicated in 2001 that Plaintiff played bingo once or *twice* per week. (Tr. 94).

[3]    The Court also notes that Plaintiff was diagnosed with migraines in 2000. Nevertheless, in Plaintiff's account of her daily activities in 2001, she noted that she was able to read for about 3 ½ hours at a time and sometimes she read at least 5 books per week. (Tr. 92). Her husband reported that Plaintiff drove daily and cooked daily. (Tr. 96). He also described Plaintiff's headaches only caused slight, occasional confusion. (Tr. 98). Such evidence is inconsistent with concentration difficulties more severe than those noted by the ALJ.

-16-

Plaintiff's alleged concentration and memory problems were attributable to her lupus.  (Tr. 459, 461, 465-66, 472).  Such conservative treatment is not consistent with debilitating symptoms.

Furthermore, there is no indication in the record that Plaintiff's physicians documented any reports of significant concentration difficulties that would have precluded the work set forth in the ALJ's RFC finding.  Her physicians also did not conduct any testing to determine the extent of Plaintiff's alleged concentration difficulties or set forth any work-related restrictions upon Plaintiff due to her alleged lack of concentration.  (Tr. 465).  Consequently, the Court cannot conclude that the ALJ erred in his assessment of Plaintiff's credibility as to her claim that her ability to concentrate was significantly diminished.

Plaintiff also argues that the ALJ improperly found her less than credible as to her claim that she could not use her upper extremities, especially her left dominant extremity, for sustained, repetitive movements.  (Tr. 21).  The ALJ acknowledged that Plaintiff was limited in some respects as to her ability to use her upper extremities.  Consequently, he limited Plaintiff to work involving: (1) pushing, pulling, lifting, and carrying no more than 5 pounds frequently and 10 pounds occasionally; (2) frequent, but not constant, forward reaching; (3) occasional reaching slightly above shoulder level; (4) frequent reaching below shoulder level; (5) no overhead reaching; (6) no use of vibratory tools; (7) no forceful or sustained gripping or grasping with the left hand; and (8) no constant, repetitive left wrist movements.  Such restrictions were consistent with Dr. Voelpel's testimony.[4]  However, the ALJ did not validate Plaintiff's claims that she could not use her upper extremities for *any* sustained, repetitive movements.  (Tr. 21, 318).  As noted by the ALJ, other

---

[4]     Although Dr. Wolohan described more restrictive limitations with respect to Plaintiff's upper extremities, the ALJ partially rejected his opinion as inconsistent with the objective, medical evidence.  Plaintiff has not challenged this finding.  (Tr. 21-24).

opinion evidence also did not support Plaintiff's claim as to the alleged severity of her upper

extremity restrictions.  (Tr. 171, 299, 301, 305-07).  Furthermore, the ALJ properly noted that

Plaintiff's use her hands and arms to play bingo was not consistent with her claim that she could not

use hands and arms for all sustained, repetitive movements since such activity requires a certain level

of repetitive forward reaching and manual dexterity.[5]

Plaintiff further contends that in crafting his RFC finding, the ALJ failed to account for the

fact that Plaintiff was required to take several naps throughout the day and to sit with her feet

elevated.  Plaintiff points to no objective evidence to support her allegation that her medical

condition was so severe that she was required to nap or rest several times a day.  None of Plaintiff's

physicians recommended such a restriction or indicated that, objectively, such rest or napping was

medically necessary.  Indeed, although Dr. Wolohan expressed an opinion that Plaintiff was unable

to work due to various restrictions, he never indicated that debilitating fatigue was one of them.[6]

Furthermore, Plaintiff's various conditions were generally described as "mild" to "moderate" by

objective testing and, as noted above, Plaintiff's treatment was conservative.  (Tr. 109, 152, 154, 171,

272).

_____

[5]       Objective testing conducted in 2000 showed that Plaintiff had mild carpal
tunnel syndrome of the left wrist and mild arthritis of the neck.  In February 2001 an MRI
showed that Plaintiff had mild, early degenerative disc disease of the cervical spine with
mild to moderate spondylotic narrowing.  There are no subsequent tests showing a change in
Plaintiff's condition.  Nevertheless, in August 2001, Plaintiff was able to drive and cook daily
despite her condition.

[6]       Although Dr. Kemerer opined that Plaintiff's subjective pain and fatigue kept
her in bed prevented her from performing her daily activities. He also opined that Plaintiff
was unable to work, the ALJ rejected these opinions as inconsistent with the objective,
medical evidence, as was noted by Dr. Voelpel.  Plaintiff has not challenged the ALJ's
determination in this regard.  (Tr. 24).

Plaintiff claims that she was required to sit with her feet elevated as advised by Dr. Wolohan. However, Dr. Wolohan set such a restriction for Plaintiff in 2004 after a dog had stepped on Plaintiff's right heel, causing tenderness to her Achilles tendon. The restriction was for only 1 to 2 weeks and was to be followed by the gradual resumption of full activities. Furthermore, it was accompanied by a recommendation that Plaintiff also exercise her right leg. Plaintiff points to no other evidence in which Plaintiff was instructed to elevate her feet as a medically necessary measure for her impairments. Although Dr. Wolohan treated Plaintiff for knee and foot pain, he never imposed any other limitations upon Plaintiff's ability to walk or stand, and he did not note in his records any testing or examination findings to support such limitations. In fact, Dr. Wolohan recommended only symptomatic treatment, ice/heat, and Tylenol. (Tr. 265, 263). Furthermore, Dr. Craig concluded that Plaintiff did not have any restrictions upon her ability to sit, stand, or walk and he indicated that Plaintiff needed no assistive device to walk. Dr. Voelpel opined that Plaintiff's medical records did not justify any sitting restrictions. Dr. Voelpel also concluded that Plaintiff could stand or walk for up to 2 hours in an 8-hour work day although she might experience discomfort upon ambulation or pain if the floor was concrete.[7] (Tr. 475-76). Nevertheless, the ALJ limited Plaintiff to sedentary work that allowed for a sit/stand at-will option and that would not require Plaintiff to walk more than 10 yards at a time.[8] Based upon the foregoing, the Court

_____

[7]    In summarizing Dr. Voelpel's testimony, the ALJ erroneously attributed this statement to Plaintiff. Although Plaintiff takes issue with this error, she fails to explain how such an error affects Plaintiff's alleged need to sit with her feet elevated.

[8]    Plaintiff also assigns error to the ALJ's statement that Plaintiff "has no impairment with walking in the right leg that was explored . . . in claimant's testimony." No such impairment was discussed by Plaintiff at the 2004 hearing although Plaintiff stated at the 2003 hearing that she could not walk very far. Plaintiff again fails to articulate how this alleged error affects the ALJ's RFC finding that Plaintiff not be required to walk more than 10 yards at a time or her claim that she needed to sit with her feet elevated.

concludes that the ALJ did not err by not crediting Plaintiff's claim that she was required to nap or rest several times a day or to sit with her feet elevated.

### 2.   <u>Hypothetical</u>

Plaintiff also claims that the ALJ posed an inaccurate hypothetical to the VE at the administrative hearing, thus rendering the VE's testimony unreliable. The hypothetical was based upon the ALJ's RFC determination. In response to the hypothetical, the VE testified that a person of Plaintiff's age, education, past relevant work experience and with Plaintiff's RFC was capable of making a vocational adjustment to other work. (Tr. 482, 484-87). The VE further testified that given these factors, the claimant could work at various jobs in the lower peninsula of Michigan, having a sedentary level of exertion such as a general clerk (3,500 jobs), information clerk (1,000 jobs) and as a surveillance system monitor (1,500 jobs). *Id.*

Where an ALJ poses a hypothetical question to a VE that fully and accurately incorporates a claimant's physical and mental limitations and the VE testifies that a person with such limitations is capable of performing a significant number of jobs in the national economy, such testimony is sufficient to support a finding that the claimant is not disabled. *Varley v. Secr'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

In forming a hypothetical, an ALJ must incorporate all physical and mental limitations reasonably established by the record. *See Varley, supra*, 820 F.2d at 79-80. However, it is well-settled that a hypothetical "need not reflect the claimant's unsubstantiated complaints." *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990); *see also Stanley v. Sec'y of Health & Human Servs.*, F.3d 115, 118 (6th Cir. 1994) ("[T]he ALJ is not obliged to incorporate unsubstantiated complaints into his hypothetical").

-20-

The only challenge raised by Plaintiff as to the ALJ's hypothetical is that the ALJ failed to incorporate her subjective complaints as noted above. The ALJ properly rejected Plaintiff's subjected complaints as not fully credible. Accordingly, the ALJ was not required to include these complaints in the hypothetical he posed to the VE. Consequently, substantial evidence supports the ALJ's determination that Plaintiff was not disabled because she could perform a significant number of jobs in the regional economy.

## VI.   <u>RECOMMENDATION</u>

The Commissioner's decision is supported by substantial evidence. Defendant's Motion for Summary Judgment (Docket # 15) should be **GRANTED**. Plaintiff's Motion for Summary Judgment (Docket # 11) should be **DENIED** and her complaint **DISMISSED**.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

-21-

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: March 07, 2007                          s/ Mona K. Majzoub
                                               **MONA K. MAJZOUB**
                                               **UNITED STATES MAGISTRATE JUDGE**

**<u>PROOF OF SERVICE</u>**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: March 07, 2007                          s/ Lisa C. Bartlett
                                               Courtroom Deputy

-22-